**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**
**February 19, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Martez Griffin,**
**Petitioner Below, Petitioner**

**vs.)  No. 19-0688** (Kanawha County 17-P-406)

**Charles Williams, Superintendent,**
**Huttonsville Correctional Center**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Martez Griffin, by counsel Charles R. Hamilton, appeals the Circuit Court of Kanawha County's July 2, 2019, order denying his amended petition for a post-conviction writ of habeas corpus. Respondent State of West Virginia, by counsel Andrea Nease Proper, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

In September of 2015, petitioner devised a plan with three associates to rob the victim, Bryson Ward. Video surveillance showed petitioner, along with an associate, entering the victim's apartment on September 22, 2015. A witness described that, upon entering the apartment, petitioner hit the victim with a large rock, causing the victim to bleed. Ultimately, petitioner demanded, and the victim surrendered, approximately nine bundles of heroin and $11,000.00 in cash to petitioner. While the victim was not killed by petitioner's hand, in an attempt to escape the apartment during the robbery, the victim fell out of a ninth-floor window to his death. Upon receipt of the victim's bounty, petitioner fled the scene and traveled to Arkansas. Text messages from petitioner's associates linked petitioner to the crime. Further, two of petitioner's associates made statements implicating petitioner in the robbery and beating of the victim.

Petitioner was arrested in Arkansas and charged with first-degree murder. Ultimately, petitioner was returned to West Virginia and Attorney Clinton Smith was appointed as petitioner's counsel. On April 26, 2016, Attorney Smith filed numerous motions on petitioner's behalf, including motions for discovery and suppression of certain evidence. At a May 6, 2016, plea hearing, petitioner accepted a binding plea agreement, pled guilty to first-degree robbery, and

1

acknowledged that, in return, he would receive a sixty-year sentence. During the plea hearing, petitioner acknowledged that his counsel went over all of the State's evidence with him and discussed possible defenses that could be asserted. Additionally, petitioner acknowledged that he understood his constitutional rights and that his counsel had discussed with him the specific rights waived by his guilty plea. Petitioner also agreed that his counsel completed "an adequate and proper investigation of this case" and that counsel did everything asked of him by petitioner. Petitioner further stated that he was "completely satisfied" with the representation he received from counsel. During the plea colloquy petitioner admitted to striking the victim, threatening the victim, and leaving with the victim's drugs and money.

Thereafter, on May 6, 2016, before the actual imposition of his sentence, petitioner filed, pro se, a motion for reconsideration of sentence arguing that his sentence was too harsh, that others similarly situated got an alternative sentence,[1] and that he was under the influence of drugs during the crime. On May 27, 2016, petitioner was sentenced to sixty years in prison. Petitioner was appointed appellate counsel who, on June 21, 2016, filed a direct appeal on petitioner's behalf, arguing that petitioner's sentence was excessive and that his trial counsel was ineffective. Petitioner's sentence was affirmed by this Court in a memorandum decision issued on June 9, 2017. *State v. Griffin*, No. 16-0594, 2017 WL 2492799 (W. Va. June 9, 2017) (memorandum decision).

On October 31, 2017, petitioner filed, pro se, a petition for writ of habeas corpus alleging ineffective assistance of trial counsel. Petitioner argued that his trial counsel failed to investigate petitioner's claim of innocence and coerced petitioner into pleading guilty. Further, petitioner argued that his trial counsel: failed to meet with him or discuss any indictment defects with him; failed to disclose the plea agreements of petitioner's co-defendants; failed to hire a private investigator; told petitioner he could not rescind his plea; and failed to interview witnesses. Petitioner further argued that his appellate counsel was ineffective in failing to file a motion for reduction of sentence.

The circuit court appointed petitioner habeas counsel who filed an amended petition for writ of habeas corpus on petitioner's behalf. In this amended petition, petitioner argued involuntary guilty plea, ineffective assistance of counsel, defects in the indictment, and a more severe sentence than expected. Respondent filed an extensive response in opposition to petitioner's amended petition.

An omnibus hearing was held in the circuit court on March 21, 2019, at which petitioner and his trial counsel testified. During this hearing, petitioner was critical of his trial counsel's failure to view surveillance videos of the crime scene. While trial counsel admitted that he did not view the surveillance video of the crime scene, he did view the video of petitioner's confession. Petitioner argued that the surveillance video, which undisputedly shows petitioner entering the residence of the victim, was exculpatory as to the murder charge against petitioner. Petitioner's

_____

[1]It is undisputed that petitioner's co-defendants received lesser sentences. However, it was established that petitioner was the "mastermind" of the robbery scheme; that petitioner inflicted physical harm upon the victim; and that petitioner "actually took part in the robbery, unlike two of the other defendants."

trial counsel acknowledged that he recommended that petitioner accept the plea deal on the robbery charge alone, as opposed to the plea deal offered for the murder charge alone, as the determinate sentence associated with the robbery charge was better for petitioner. Trial counsel was concerned that if petitioner were to go to trial on both charges, he would "likely be facing a felony murder charge due to the death of the victim herein." By accepting the robbery plea deal, petitioner was removed from the jeopardy of receiving a life sentence without mercy.

By order entered on July 2, 2019, the circuit court denied petitioner's amended petition for writ of habeas corpus. Specifically, the circuit court found that petitioner's claims were "utterly belied by the careful taking of the original plea" and that "[t]he evidence of record demonstrates that no error of a constitutional dimension occurred in the underlying proceeding in which [p]etitioner entered into a knowing, voluntary, and intelligent guilty plea represented by effective counsel." It is from the circuit court's July 2, 2019 order that petitioner now appeals.

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex. rel. Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner asserts a single assignment of error arguing that the circuit court erred in finding that petitioner's trial counsel was not ineffective. Our review of the record supports the circuit court's decision to deny petitioner's amended petition for writ of habeas corpus. Petitioner's arguments herein were thoroughly addressed by the circuit court in its forty-page order denying petitioner habeas relief. That order includes detailed and well-reasoned findings and conclusions as to the assignment of error now raised by petitioner on appeal. Because we find no clear error or abuse of discretion in the circuit court's order or the record before us, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignment of error raised on appeal and direct the Clerk to attach a copy of the circuit court's July 2, 2019, "Final Order With Findings of Fact and Conclusions of Law" to this memorandum decision.

For the foregoing reasons, we affirm the circuit court's July 2, 2019, denial of petitioner's amended petition for writ of habeas corpus.

Affirmed.

**ISSUED:** February 19, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice William R. Wooton

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
MARTEZ A. GRIFFIN,
     Petitioner,

v.

                                         Civil Action No. 17-P-406
                                         Judge Louis H. Bloom

DONNIE AMES, SUPERINTENDENT,
MOUNT OLIVE CORRECTIONAL COMPLEX, [1]
     Respondent.

### FINAL ORDER WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pending before the Court is an *Amended Petition for Writ of Habeas Corpus* filed on September 5, 2018, by the Petitioner, Martez Griffin, by counsel, Elizabeth G. Kavitz. Following a review of the underlying criminal file; the *Losh* list; the *Petition* and memorandum of law filed by Petitioner; the response to the petition filed by the Respondent Warden; the transcripts of the plea hearing and sentencing hearing; the testimony at the omnibus evidentiary hearing; and the pertinent law, the Court makes the following findings of fact, conclusions of law with discussion, and final order. The Court **FINDS** that Petitioner has not met his burden as to any evidentiary ground and thus **ORDERS** that the *Petition* be **DENIED**.

### FINDINGS OF FACT

1. Petitioner and his then co-defendants were indicted by the January 2016 term of the Kanawha County Grand Jury.[2]

---

[1] This action was initially filed against "Ralph Terry, Warden, Mount Olive Correctional Center." However, effective July 1, 2018, the positions formerly designated as "wardens" are now designated "superintendents" pursuant to W. Va. Code § 15A-5-3. Further, Donnie Ames is now Superintendent of Mount Olive Correctional Complex and has replaced Ralph Terry as Respondent pursuant to Rule 41(c) of the *Rules of Appellate Procedure*.
[2] Indictment 16-F-150.

1

2. The grand jury charged Petitioner, Brian Parks, Tyler Ferrebee, and Lisa Ferrebee with the offense of first-degree robbery by means of striking and beating Bryson Ward, and the offense of first-degree murder of Mr. Ward. The offense happened in September 2015.

3. Bryson Ward ("the victim") died after being assaulted in an apartment and falling nine stories from a window through which he climbed. Following his death, he tested positive for marijuana but negative for other drugs or alcohol. He also had multiple blunt force injuries.[3]

4. Charleston Police responded to a report of a disturbance on September 23, 2015. The tenant of Apartment 812 Renaissance Circle reported the disturbance above her, on the ninth floor.[4]

5. After entering the 9th floor apartment, police saw a puddle of blood in the kitchen, a hole in the wall, and bloody hand prints along the hallway. That apartment was rented by Lisa Ferrebee.[5]

6. The victim was found lying on the ground outside the building. The tenant in apartment 812 said she heard loud noises that sounded like fighting from upstairs, but they stopped. However, she then heard knocking on her 8th floor window. She saw a man dangling from the building, yelling at her to let him in. Before she could pull him through the window, the victim fell.[6]

7. Petitioner and Lisa Ferrebee fled and were apprehended in Arkansas after the victim died.[7]

8. Petitioner was seen on surveillance video outside Apartment 912 immediately before the crime. Lisa Ferrebee lived in that apartment. A witness reported to the police that during the day of September 22, 2015, Petitioner was angry with the victim. Tyler Ferrebee told the police that Petitioner and his co-defendant Brian Parks hatched a plan to rob the victim and cut off his "dick."[8]

---

[3] Autopsy Report, provided in discovery.
[4] CPD Incident Report, provided in Discovery, 16-F-150.
[5] Id.
[6] Id.
[7] Id.
[8] Id.

2

Tyler Ferrebee agreed to be the driver. Petitioner and Parks went to the apartment. When they came back, Petitioner stated they had beaten the victim. There was a text message on Ferrebee's phone to Petitioner's phone at 11:39 p.m. on September 22 stating "if you don't do it now [sic] im gonna come up and f*** you up and b up I got the car running ready to roll with this s***."[9]

9. Additional text messages on Tyler Ferrebee's phone between him and Lisa Ferrebee from 11:00p.m. through 11:45 p.m. indicated that Ms. Ferrebee was aware of the crime and that Petitioner was participating in the offense during those times.[10]

10. Ms. Ferrebee told police in Arkansas that she was aware the victim would be beaten and tied up with duct tape and robbed. She was with Petitioner when he purchased duct tape. The purchase of the duct tape was confirmed by store surveillance video.[11]

11. Lisa Ferrebee text messaged her son, Tyler Ferrebee, asking if "they" had taken the tape and gloves; she also indicated that she was aware that it would take a "few" to tie him up. A receipt for duct tape and gloves was found in the car Lisa Ferrebee was driving in Arkansas when she and Petitioner were arrested.[12]

12. The police investigation revealed that Petitioner and Lisa Ferrebee were living together and dating. Lisa Ferrebee had made complaints and accusations about the victim, and Petitioner, before the crime, was "ranting" and making threatening statements about the victim.[13]

13. Video surveillance from the apartment complex showed Petitioner, co-defendant Parks, and co-defendant Tyler Ferrebee going to and from apartment 912 during and after the crime.

---

[9] *Id.* (edited).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* (See *Affidavit for Search Warrant*).

3

14. Tyler Ferrebee told police that he, Petitioner, and Parks planned to rob and beat the victim. They took approximately 9 bindles of heroin and $11,000 from the victim. After the robbery, Tyler Ferrebee drove Petitioner and Lisa Ferrebee to a hotel, and those two vanished.[14]

15. Lisa Ferrebee and Petitioner were arrested in Arkansas, while Parks voluntarily turned himself in to Charleston police.[15]

16. Interviews with the participants revealed that Petitioner had used a large marble rock to beat the victim in the head. Petitioner told police that he hit the victim numerous times with a marble-like rock to knock him out.[16]

17. Detective Cooper was involved in the investigation into the victim's death.[17] Police were dispatched to check on the disturbance at 912 Renaissance Circle. The door knob to that apartment was broken and no one answered the door. As the officers were leaving, they were told someone had been hanging from the building and had just fallen. The victim was found at the bottom of the building, lying face down.[18]

18. Ms. Levine, the tenant in apartment 812, told police she heard the disturbance and then heard a tapping on her eighth story window. She saw feet hanging, kicking her window. Ms. Levine cut her screen and tried to pull the victim in by his legs, but he was too heavy and fell.[19]

19. When the police went into apartment 912, they saw holes in the drywall, a bloody fork, pools of blood, and blood smears.[20] A friend of Lisa Ferrebee's told the police that Ms. Ferrebee had stated the victim tried to assault her on two occasions and succeeded on one.[21]

---

[14] Id.
[15] Id.
[16] Id.
[17] Grand Jury Transcript, Mar. 31, 2016, at 5.
[18] Id.
[19] Id. at 7.
[20] Id. at 8.
[21] Id. at 9.

4

20. That witness told police that Ms. Ferrebee and Petitioner were boyfriend and girlfriend.[22] The witness stated that she (the witness) was in a vehicle when Ms. Ferrebee and Petitioner were discussing the assaults upon Ms. Ferrebee by the victim. Petitioner stated about the victim "That mother***** ain't s***."[23]

21. Surveillance video of the hallway outside apartment 912 showed Petitioner wearing a large watch and entering the apartment, then Parks entering minutes later.[24] Some time passed, then a large white male entered the hallway. This was Tyler Ferrebee. Ferrebee could not open the door, so he left. Shortly thereafter, Parks and Petitioner left the apartment running down the hallway. Petitioner did not have the watch on, and a broken watch was found in the bedroom where the victim fell from the window.[25]

22. Each of the co-defendants, including Petitioner, gave statements to the police.[26] Ms. Ferrebee told the police in Arkansas that the victim had forced himself upon her. She told police that she told her boyfriend, Petitioner, about the assaults, and he became very angry. Petitioner, Tyler Ferrebee, Lisa Ferrebee, and Brian Parks came up with the plan to rob the victim. Lisa Ferrebee told police that they bought gloves and duct tape at Family Dollar. The plan was to duct tape the victim so notification to police would be delayed.[27]

23. Brian Parks told police that Tyler Ferrebee told him the victim had raped his mother, Lisa Ferrebee.[28] Parks was to be at the robbery to back up Petitioner in case the victim got the better of Petitioner. Petitioner went into the apartment first, Parks went up later. The two were there for forty minutes or so, with nothing happening. Petitioner and the victim started fighting.

---

[22] *Id.* at 10.
[23] *Id.* at 10-11 (edited).
[24] *Id.* at 11-12.
[25] *Id.* at 12-13.
[26] *Id.* at 13.
[27] *Id.* at 14-16.
[28] *Id.* at 17.

5

The victim stated he did not want to fight. Petitioner was armed with a ball made from marble or stone, somewhat larger than a softball.[29] Petitioner told the victim to give Petitioner everything or he (the victim) would be beaten. The victim said he had give him everything. Nonetheless, Petitioner proceeded to beat the victim with the stone.[30] Petitioner hit him several times in the head; Parks hit the victim at least twice. Parks and Petitioner took $11,000 in cash, heroin, and the victim's cell phones.[31]

24. Tyler Ferrebee told the police he was the driver. He went upstairs because he thought the robbery was taking too long.[32]

25. Petitioner told the police in Arkansas that the four of them planned the robbery but were also angry that the victim had assaulted Ms. Ferrebee. Petitioner admitted to hitting the victim in the head with the large marble ball.[33] The State made it clear to the grand jury that the presentment was under the felony murder rule, which provides that if someone dies during the course of a felony, the individuals who commit the felony are responsible for the death of that person.[34] All four were acting in concert and planned the robbery.[35]

26. Ultimately, Petitioner reached a plea agreement with the State. The agreement provided, in pertinent part, that Petitioner would plead guilty to first degree robbery as contained in Count 1 of the indictment; Count 2, murder, would be dismissed. The plea was intended to be binding under Rule 11(e)(1)(c) of the *West Virginia Rules of Criminal Procedure* with the

---

[29] *Id.* at 18.
[30] *Id.* at 19.
[31] *Id.* at 20.
[32] *Id.* at 22.
[33] *Id.* at 23.
[34] *Id.* at 26.
[35] *Id.* at 26-27.

6

appropriate disposition being sixty (60) years in prison. If the Court did not sentence Petitioner to sixty years, the parties would be restored to their original positions and would proceed to trial.[36]

27. Before entering his oral plea of guilty, Petitioner and his lawyer both completed written documents. Among the documents was a written plea of guilty in which Petitioner acknowledged the rights he had attendant to a trial and was waiving by pleading guilty. He also acknowledged that he was waiving all pre-trial defects regarding his arrest, the gathering of evidence, statements, and any non-jurisdictional defects.[37]

28. He acknowledged that he would be sentenced to sixty years, and that if the Court gave a sentence other than sixty years, he could withdraw his plea.[38]

29. Petitioner completed a rights waived by plea of guilty form. Again, he acknowledged that he understood that he had and was waiving any number of rights including: the right to plead not guilty or stand mute; the right to a jury trial with a jury consisting of twelve impartial citizens; the right to have input in jury selection; the right to a public trial; the right to remain silent or to testify; the right to compel witnesses to appear and to present evidence; the right to cross-examine witnesses; the right to counsel at trial and appeal; the right to appeal trial errors; the right to proof beyond a reasonable doubt; the right to a unanimous jury verdict; the right to move to suppress illegally obtained evidence and statements; and the acknowledgement that he would be convicted without further proceedings.[39]

30. Petitioner and his attorney completed the Defendant's statement in support of guilty plea. Petitioner stated he was 24 years of age and had completed 11 years of education. He understood he could consult with a lawyer before pleading guilty or other proceedings. Petitioner

---

[36] *Plea Letter.*
[37] Written Plea of Guilty, p. 2.
[38] *Id.* at 3.
[39] *Waiver Form.*

7

stated that he was aware of the elements of robbery, those being that he took money and drugs from the victim by means of force and violence.[40]

31. Petitioner understood the minimum sentence for first degree robbery was ten years and that there was no maximum sentence. He stated he had never been treated for mental illness, nor had he ever been addicted to drugs; he was not under the influence when he filled out the form.[41]

32. Petitioner had discussed with his lawyer every fact and circumstance of the case and had told him everything. Petitioner acknowledged that the decision to plead guilty was his and his alone, no matter what his lawyer had said, and that he bore full responsibility for that decision. He had signed the plea agreement freely and voluntarily, and the plea agreement was accurate. Petitioner was promised nothing outside the plea agreement in exchange for the plea.[42]

33. On the Defendant's statement, Petitioner again acknowledged that he understood his constitutional rights regarding the proceeding and that he was waiving those rights. Petitioner was satisfied with his attorney and wanted to plead guilty.[43]

34. Petitioner was pleading guilty of his own free will because he believed himself to be guilty.[44]

35. His lawyer also completed a statement in support of the guilty plea. Counsel had been appointed and had ample time to prepare any possible defense. Counsel had met with his client and discussed all possible defenses. Every element of the charge had been explained to the client.[45]

36. Counsel had explained the constitutional rights surrendered by a guilty plea, and further explained the consequences of the guilty plea. Counsel believed Petitioner understood the crime

---

[40] *Defendant's Statement.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Attorney's Statement*

8

to which he was pleading guilty. Counsel, Clinton Smith, had investigated the case and believed there to be sufficient admissible evidence available to the State to support a guilty verdict. Mr. Smith had discussed the State's discovery with his client.[46]

37. At the plea hearing, Counsel placed the terms of the plea agreement on the record.[47] Petitioner was pleading guilty to first degree robbery as contained in Count 1; the murder count, Count 2, would be dismissed. The parties agreed that this was a binding plea under the *Rules* and that a determinate term of sixty years was the appropriate disposition. Both Counsel and Petitioner had signed the plea letter.[48]

38. Co-defendant Parks was pleading guilty at the same time; however, his agreement provided for a determinate term of fifty years.[49]

39. In response to the Court's inquiry, Counsel noted that Petitioner was 24 years old and had been in Charleston since 2012. He had a misdemeanor conviction for possession, but no felony convictions.[50]

40. The Assistant Prosecutor explained that the State believed the pleas were appropriate because two other co-defendants had already pleaded.[51] The State made different recommendations in the plea offers because the State believed the four co-defendants had varying degrees of culpability. The State noted that Ms. Ferrebee was involved in preparing the robbery but did not go to the apartment. Tyler Ferrebee was the driver, while Parks and Petitioner went into the apartment and committed the robbery.[52]

---

[46] *Id.*
[47] Plea hearing, May 6, 2016, at 3.
[48] *Id.* at 3-4.
[49] *Id.* at 4.
[50] *Id.* at 5.
[51] *Id.* at 7.
[52] *Id.* at 7-8.

9

41. Counsel for Petitioner stated that the issue of felony murder would be hotly contested at trial.[53] However, counsel believed there "is certainly sufficient evidence to, to—for [Petitioner] to be convicted of the aggravated robbery."[54] Because of that evidence and the risk of going to trial on felony murder, the plea was in Petitioner's best interest because it limited his prison exposure. Dismissal of the murder count meant Petitioner could not be sentenced to life without the possibility of parole. The binding plea agreement with a sixty-year sentence further limited Petitioner's exposure because a robbery conviction does not carry a maximum sentence; Petitioner thus could have been sentenced to more than sixty years.[55] Counsel believed the sentence accurately reflected Petitioner's culpability and the seriousness of the crime.[56]

42. Counsel for the co-defendant noted that the State had a very clear-cut case as to the robbery. All four defendants made statements to the police that were consistent with one another.[57]

43. Petitioner was placed under oath.[58] Only after being sworn did he complete the above-referenced paperwork.[59] Petitioner was asked whether the representations made by his lawyer regarding the terms and conditions of the plea were accurate. He stated they were. Petitioner understood the minimum sentence for robbery was ten years. Petitioner understood he was entering a binding plea and that he would receive a sentence of sixty years.[60]

44. Petitioner's attorney had told him he was prepared to try the case if that is what Petitioner wanted. His attorney had gone over the State's evidence with him and discussed any possible defenses. Petitioner agreed that his attorney had made an adequate and proper

---

[53] *Id.* at 8.
[54] *Id.* at 9.
[55] *Id.* at 9-10.
[56] *Id.* at 10.
[57] *Id.* at 11.
[58] *Id.* at 13.
[59] *Id.* at 14.
[60] *Id.* at 15.

10

investigation of the case. His attorney had done everything Petitioner asked or believed needed done in order to make a recommendation to plead guilty or go to trial.[61] Petitioner was completely satisfied with the representation he had received. He again stated that his attorney had gone over the State's evidence with him, talked about defenses, and prepared for trial.

45. Counsel had gone over Petitioner's constitutional rights and had discussed not only the rights waived by the guilty plea form but also the rights contained in the written plea of guilty.[62] Petitioner had no questions about his rights; he understood that the indictment was only a charging document and was not evidence of guilt.

46. Petitioner understood that if he went to trial the jury would be instructed that Petitioner could not be convicted unless the State proved every element of the offense beyond a reasonable doubt.[63] Petitioner understood that the penalty for robbery was the same whether he pleaded guilty or was convicted by jury verdict. Petitioner agreed and understood there were strategic advantages, as proffered by his attorney, for entering the plea: the dismissal of the murder charge with its accompanying life sentence and a limitation of penalty on the robbery.[64]

47. Petitioner agreed that Counsel had negotiated the plea with his consent and that he was satisfied with the plea, including the sentence of sixty years.[65] Petitioner stated he was 24 years of age and had one eight-month-old child.[66] He had dropped out of school in the middle of twelfth grade. He understood and could read and write English. He had never been treated or hospitalized for mental illness or a drug or alcohol addiction.[67] He was not under the influence of drugs or alcohol at the time he pleaded. Counsel stated that during the time he had represented Petitioner,

---

[61] *Id.* at 16.
[62] *Id.* at 17.
[63] *Id.* at 18.
[64] *Id.*
[65] *Id.* at 19.
[66] *Id.* at 18-19.
[67] *Id.* at 20.

11

Petitioner had been oriented as to time and place and had normal recollection of past events.[68] Counsel believed his client was competent to plead.[69]

48. Petitioner understood he was not required to plead guilty.[70] Before the Court reviewed the paperwork and some of the listed rights, the Judge stated "as I said before, if you have questions about anything in this paperwork that I don't go over with you, please ask me."[71]

49. Petitioner understood that by pleading guilty he was giving up his right to have a fair and impartial panel of twelve decide his guilt and that he and his attorneys would be involved in the selection of those jurors. He understood he was not required to prove anything at trial and the burden was on the State to prove every element beyond a reasonable doubt.[72]

50. Petitioner understood he could not be compelled to testify and that if he exercised his right to remain silent, the jury would be advised that it could draw no adverse inference from his silence or speculate about the reason for his silence.[73] Petitioner acknowledged that by pleading guilty he was giving up his right against self-incrimination and was admitting guilt.[74] He understood he had the right to confront and cross-examine his accusers and had the right to subpoena witnesses to testify on his behalf. Petitioner understood he could testify in his own defense if he so chose.[75] Petitioner understood that his lawyer had the ability to move to suppress illegally obtained evidence and that Petitioner would have the right to appeal the Court's rulings.[76] Petitioner acknowledged that by pleading guilty he was waiving all pre-trial defects with regard to

---

[68] *Id.* at 20-21.
[69] *Id.* at 21.
[70] *Id.* at 23.
[71] *Id.*
[72] *Id.*
[73] *Id.* at 23-24.
[74] *Id.* at 24.
[75] *Id.* at 24-25.
[76] *Id.* at 25.

12

his arrest, the gathering of evidence, and any statements. Petitioner understood that making any false statement during the plea proceeding could result in false swearing or perjury charges.[77]

51. Petitioner again agreed that his lawyer had told him he would represent Petitioner at trial. Petitioner had not discussed his decision to plead guilty with anyone but believed he could make that decision on his own.[78]

52. No one had made any promises of leniency or any other promise beyond the plea agreement to induce Petitioner to plead guilty against his free will. No one had threatened, intimidated, or coerced Petitioner to induce a plea against his free will. Petitioner was indeed pleading guilty of his own free will.[79]

53. Petitioner knew that a guilty plea was a conviction just as much as a jury conviction. He had no questions about his plea agreement, constitutional rights, or the consequences of the plea, including the penalty to be imposed.[80]

54. Petitioner laid the factual basis for the plea. He stated the crime happened at Vista View City Park in Charleston, Kanawha County.

> DEFENDANT PETITIONER: I went up to the house, smoked with the victim. I struck the victim multiple times in the bedroom, threatened the victim and beat the victim up, received the goods and I proceeded to leave.
>
> THE COURT: Received drugs and money; is that correct?
>
> DEFENDANT PETITIONER: Yes, Your Honor.

*Id.* at 29. After the factual basis, counsel confirmed he had told Petitioner he would represent him at trial.[81] Petitioner again stated he was completely satisfied with the representation he received. Petitioner knew his activity was against the law. Petitioner told the Judge he had understood all of

---

[77] *Id.* at 26.
[78] *Id.*
[79] *Id.* at 27.
[80] *Id.* at 28.
[81] *Id.* at 30.

13

the questions and had answered them truthfully. Petitioner acknowledged that his guilty plea was done freely and voluntarily.[82]

55. A disposition hearing was held on May 26, 2016. At disposition, Petitioner apologized for the death of the victim. He also apologized to his daughter.[83] Petitioner was sentenced to the agreed-upon sixty years.[84]

56. Despite the plea being binding, Petitioner filed a motion to reconsider or reduce his sentence. That motion was denied as untimely. Moreover, the Court found no persuasive reason to amend Petitioner's sentence.[85]

57. Petitioner filed a direct appeal. On appeal, Petitioner challenged his sentence and also raised the issue of ineffective assistance of counsel. By memorandum decision dated June 9, 2017, the Supreme Court of Appeals of West Virginia affirmed Petitioner's conviction and sentence.[86]

58. The Supreme Court's decision noted the fact that Petitioner and his co-defendants forcibly broke into an apartment and robbed the victim of money and heroin. Petitioner struck the victim in the head. After the robbery, the victim attempted to climb out a window and fell to his death.[87] The decision further noted that at the plea hearing Petitioner understood he was being sentenced to the agreed-upon term of incarceration, that he was waiving certain constitutional rights, and that he was entering into a voluntary plea agreement.[88]

59. Although Petitioner noted dissatisfaction with his sentence, the Court affirmed it. The Court undertook a proportionality analysis. The Court asked whether the sentence shocked the conscience of court and society. If found to be "shocking," a sentence is analyzed to determine

---

[82] *Id.* at 31.
[83] *Sentencing Transcript*, May 26, 2016, at 3
[84] *Id.* at 4.
[85] *Motion* and *Order*, 16-F-150.
[86] *State v. Griffin*, 2017 WL 2492799, No. 16-0594 (June 9, 2017).
[87] *Id.* at *3.
[88] *Id.* at *4.

14

whether it is disproportionate considering the nature of the offense, the legislative purpose behind the punishment, and a comparison of the sentence with other jurisdictions and other offenses in the same jurisdiction.[89]

60. The Court determined that Petitioner's sentence did not shock the conscience based upon the circumstances of the offense and the fact that Petitioner agreed to the sentence.[90] Moving to the objective test, the Court noted that aggravated robbery involved a high potential for violence and injury to the victim. The sentence for robbery gives recognition to the seriousness of the offense while allowing for discretion to sentencing courts to consider aggravating and mitigating factors. The Court noted that other jurisdictions permit similarly long prison sentences for first-degree robbery. Moreover, proportionality challenges have been rejected in West Virginia even where sentences imposed have exceeded the sixty-year sentence imposed upon Petitioner.[91] The Court declined to address the issue of ineffective assistance of counsel on direct appeal.

61. With the assistance of counsel, Petitioner has filed an *Amended Petition for Writ of Habeas Corpus* which alleges the following grounds: involuntary guilty plea based upon Petitioner's lack of understanding of his constitutional rights; ineffective assistance of counsel in failing to move the court to reconsider the sentence, failure to take an appeal; failure to communicate adequately with Petitioner; failure to contest the defective indictment in that the indictment fails to state a date certain for the offense of robbery; failure to obtain videos containing potentially exculpatory evidence; a claim that the indictment fails to charge an offense; severer sentence than expected; and excessive sentence.

---

[89] *Id.* at **5-6 (internal citations omitted).
[90] *Id.* at 6.
[91] *Id.* at 6-8.

62. An omnibus evidentiary hearing was held on March 21, 2019, at which Petitioner and trial counsel each testified. Insofar as credibility determinations must be made, this Court **FINDS** the testimony of trial counsel to be more credible than Petitioner in those areas where the testimony conflicts. This is based, in part, upon the contradictions between Petitioner's testimony at the plea hearing and at the omnibus hearing when he had been sworn to tell the truth at both hearings. This determination is also based, in part, upon the fact that Petitioner has a vested interest in the outcome of this habeas proceeding while trial counsel does not.

63. Petitioner was sworn to tell the truth.[92] Counsel and Petitioner, on the record, went over every contention contained in the *Losh* list.[93] The three issues raised were ineffective assistance of counsel, defects in the indictment, and excessive sentence/severer sentence than expected.[94] Petitioner acknowledged he was not raising ineffective assistance of appellate counsel.[95] The Court **FINDS** that Petitioner understood that any issue (with very limited exception) not raised today was waived for any future post-conviction proceeding in either state or federal court. Further, the Court **FINDS** that such waiver was done freely and voluntarily.

64. Petitioner acknowledged that by raising the issue of ineffective assistance of counsel, he was waiving the privilege of confidential communications between him and his trial attorney, pursuant to the West Virginia *Rules of Professional Conduct*.[96]

65. Petitioner stated counsel met with him three times or fewer before he pleaded.[97] They did speak on the phone; Petitioner did not estimate a number of times they spoke.[98]

---

[92] Omnibus transcript, March 21, 2019 at 3.
[93] *Id.* at 5-13.
[94] *Id.* at 15.
[95] *Id.* at 16.
[96] *Id.* at 19.
[97] *Id.* at 18.
[98] *Id.* at 20.

16

66. Petitioner stated he had received the file material from his counsel but did not have access to material on discs.[99]

67. Petitioner stated that no motion to reduce bond was made on his behalf.[100] The Court notes that Petitioner was charged with murder, a crime for which bail is discretionary and not mandatory. Bail was not set on the murder charge. Petitioner proffered nothing during either trial or this habeas proceeding which would have persuaded this Court to reduce bail on the robbery charge or to grant bail on the murder charge.

68. A point of contention for Petitioner is that he did not know whether counsel ever viewed video from the hallway of the apartment building where the crime occurred, which Petitioner proffered exculpated him from murder.[101] The Court **FINDS** the issue of whether the video exculpated him from murder is irrelevant to these proceedings. Petitioner pleaded guilty to robbery, and habeas counsel testified, *infra*, that he believed there to be a valid defense to the murder charge, and that if he had not personally viewed the video, he was aware of its contents.

69. Petitioner was asked "[d]o you think that evidence, that video, could have exculpated you, could have shown that you were not guilty of *the crime you took a plea to?*"[102] Petitioner stated, again, the video exculpated him of murder. The video did not exculpate him from the robbery, and Petitioner did not claim that it did. In fact, as to the robbery, this Court **FINDS** the video, as represented in these proceedings, inculpates Petitioner of robbery because it places him at the scene of the crime.

70. Petitioner rejected a plea offer to plead to first degree murder, but accepted an offer to plead to first degree robbery. He understood the statutory sentence for robbery was not less than

---

[99] *Id.* at 21-22.
[100] *Id.* at 22.
[101] *Id.* at 23-24.
[102] *Id.* at 23. (Emphasis added).

17

ten years and an indeterminate number of years upward.[103] He was offered "sixty flat," which Petitioner knew, with good time, resulted in imprisonment of fifteen to thirty years.[104]

71. Petitioner felt his sentence was excessive. Trial counsel did not file a motion to reduce sentence.[105]

72. Petitioner acknowledged that he told the police "[y]ou could say that I robbed this man."[106] Further, his co-defendants gave statements in which they confessed to the plan to rob the victim. Petitioner acknowledged that, while under oath at his guilty plea, he laid the factual basis for the plea and admitted beating the victim and taking his property.[107]

73. Petitioner acknowledged signing the waiver of rights and understanding them as they were explained.[108]

74. Petitioner understood he would receive a sixty-year sentence, and that is the sentence he received.[109]

75. Petitioner professed not to remember whether the guilty plea paperwork asked if the decision to plead guilty was his alone and that he bore full responsibility for it.[110] He testified he could still disagree with that statement even though he signed the plea paper indicating he understood the decision to plead guilty was his responsibility alone.[111]

76. He acknowledged that he did not tell the Court that his plea was involuntary.[112] Petitioner remembered stating during the plea that his lawyer had told him he would try the case,

[103] *Id.* at 26.
[104] *Id.*
[105] *Id.* at 27.
[106] *Id.* at 30.
[107] *Id.* at 31.
[108] *Id.* at 31-32.
[109] *Id.* at 32.
[110] *Id.* at 33.
[111] *Id.* at 33-34.
[112] *Id.* at 34.

18

and that his attorney stated he had discussed all of the State's evidence and all possible defenses with Petitioner.[113] Petitioner agreed that he had stated his lawyer had made a proper investigation of the case and that there were strategic reasons for the plea.[114]

77. Petitioner acknowledged that his lawyer discussed defenses to the murder, but also acknowledged that even if found guilty of only robbery, he could have received more than a hundred years as a sentence.[115]

78. Petitioner's trial counsel testified. Counsel did not remember a specific number of times he met with Petitioner, but did not agree that it was fewer than three times as Petitioner suggested.[116]

79. Counsel did not respond to any mail sent by Petitioner from the jail because of his belief that corrections officers read legal mail, even though they are not supposed to.[117]

80. Counsel did not believe written or telephonic communication at the jail to be secure, and told Petitioner as much. Petitioner never asked Counsel why he did not respond to letters.[118]

81. Counsel remembered clearly viewing the confession video and believed he saw the surveillance video.[119]

82. Counsel discussed the surveillance video with co-counsel, and they determined that the crucial part of the video was the time stamp at which Petitioner arrived and left. Counsel was unsure about seeing the video, but agreed that it potentially exculpated Petitioner of murder, but that it did not exculpate him from the robbery.[120]

---

[113] Id.
[114] Id. at 35.
[115] Id. at 36.
[116] Id. at 38.
[117] Id. at 38.
[118] Id. at 40.
[119] Id. at 41.
[120] Id. at 42.

19

83. Counsel discussed with his client the defense to murder, which is that Petitioner had left the scene before the victim exited the window. That is largely the sole import of the video as well. Again, the video inculpates Petitioner as to robbery.

84. Counsel did not "encourage" his client to plead guilty. He advised him to accept the plea when the plea became binding in nature.[121] Counsel discussed the risk of accepting a non-binding plea with his client, particularly that the sentencing Court can pick any number larger than ten. Petitioner understood that risk.[122]

85. Counsel was prepared to go to trial if Petitioner did not plead guilty and discussed the risks of trial, as well as the possibilities of either winning or losing at trial.[123]

86. Counsel filed no post-plea motions. He did not believe there were grounds either to reduce the sentence or to appeal. The plea went the way it was supposed to and Petitioner received the agreed-upon sentence.[124]

87. Counsel testified at the omnibus hearing pursuant to a subpoena.

88. Counsel negotiated the plea to become binding because he wanted certainty for his client as opposed to an open-ended sentence. Counsel was personally aware of individuals who had received sentences greater than sixty years in Kanawha County cases.[125]

89. The video surveillance only confirmed for Counsel what he already believed, and the defense he had prepared. That is, Petitioner and his co-defendant left the apartment, then the victim, on his own, crawled out the window and fell to his death.[126]

---

[121] *Id.* at 43.
[122] *Id.* at 43-44.
[123] *Id.* at 44.
[124] *Id.* at 45.
[125] *Id.* at 46-47.
[126] *Id.* at 47.

20

90. The video in no way exculpated Petitioner from the robbery.[127] Petitioner simply had no defense as to the robbery.

91. Counsel was prepared to try the case if Petitioner rejected the plea. Although the case was significant, neither the facts nor the law were complex.[128]

92. Counsel spent a sufficient amount of time with his client and a sufficient time reviewing the evidence to make an informed recommendation to his client regarding whether or not to plead guilty.[129]

93. Counsel discussed with his client the strengths and weaknesses of the State's case with regard to both felony murder first-degree robbery.[130]

94. Counsel believed Petitioner's plea to be voluntary, knowing, and intelligent.[131]

## CONCLUSIONS OF LAW AND DISCUSSION

1. Jurisdiction and venue are properly in Kanawha County because Petitioner's crimes and conviction occurred in Kanawha County.

2. Petitioner has been convicted of a crime(s) and is currently incarcerated so he may pursue relief by virtue of a petition for writ of habeas corpus.

3. In *State ex rel. Tune*, the West Virginia Supreme Court explained that "[t]he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law."[132]

---

[127] *Id.* at 48.
[128] *Id.* at 49.
[129] *Id.* at 50.
[130] *Id.* at 50.
[131] *Id.*
[132] Syl. Pt. 1, *State ex rel. Tune v. Thompson*, 151 W. Va. 282, 151 S.E.2d 732 (1966).

21

4. A petition for writ of habeas corpus is advanced to review errors of constitutional dimension; a habeas corpus action is not a substitute for judicial review of ordinary trial error.[133]

5. Syllabus Point 4 of *State ex rel. McMannis v. Mohn*[134] states in part that a "habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed."

6. "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'"[135] The burden is on Petitioner to prove his claims by a preponderance of the evidence.

7. According to the *Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia*, courts are required to conduct an initial evaluation of habeas petitioners before appointing counsel or requiring an answer from the respondent.[136] Further, the court may refuse the petition if it is satisfied that petitioner is entitled to no relief after the court reviews the petition, documentary evidence, the record of the underlying conviction, as well as the record of any other prior petitions.[137]

8. Petitioner has been "convicted of a crime and incarcerated under sentence of imprisonment therefore" within the meaning of West Virginia Code § 53-4A-1(a). Venue lies in Kanawha County pursuant to Rule 3(a) of the *Rules Governing Post-Conviction Habeas Corpus*

---

[133] Syl. Pt. 4, *State ex rel. McMannis v. Mohn*, 163 W. Va. 129, 254 S.E.2d 805 (1979); Syl. Pt. 4, *State ex rel. Kitchen v. Painter*, 226 W. Va. 278, 700 S.E.2d 489 (2010).
[134] 163 W. Va. 129, 254 S.E.2d 805 (1979).
[135] *State ex rel. Harrison v. Coiner*, 154 W. Va. 467, 476, 176 S.E.2d 677, 682 (1970).
[136] W.Va. R. Hab. Corpus, Rule 4(b).
[137] W. Va. Code § 53-4A-3(a).

*Proceedings in West Virginia* because Petitioner was convicted and sentenced in the Circuit Court of Kanawha County.

9. The Supreme Court of Appeals of West Virginia has stated that "[o]ur post-conviction habeas corpus statute . . . clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding."[138] The initial habeas corpus hearing is *res judicata* as to all matters raised and all matters known or which with reasonable diligence could have been known.[139] Therefore, only ineffective assistance of habeas counsel, newly discovered evidence, or a change in law favorable to the applicant and which may be applied retroactively can be considered in any subsequent habeas petition.[140]

10. A petitioner is entitled to careful consideration of his claims.[141] Such consideration is mandated in order to assure that no violation of Petitioner's due process rights could have escaped the attention of either the trial court or the State Supreme Court. Circuit courts denying or granting relief in a habeas corpus case are statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by a petitioner and to state the grounds upon which the matter was determined. The State Supreme Court has held that where the petitioner fails to provide adequate factual support for his allegations and makes nothing more than mere blanket assertions without the appropriate factual basis, the claims must be denied.[142]

11. Pursuant to West Virginia Code § 53-4A-7, the court shall enter an order denying relief if based on the petition, affidavits, exhibits, records, and other documentary evidence, the

---

[138] Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984).
[139] Syl. pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981); *Call v. McKenzie*, 159 W. Va. 195, 220 S.E.2d 665 (1975).
[140] *Id.*
[141] *State ex rel. Markley v. Coleman*, 215 W. Va. 729, 601 S.E.2d 49 (2004).
[142] *Id.*

23

petitioner fails to meet a probable cause standard, or if the grounds in the petition have previously been adjudicated or waived.

12. Findings of fact made by a trial court in a habeas proceeding "will not be set aside or reversed by [the State Supreme Court] unless such findings are clearly wrong."[143] A circuit court's final order and disposition are reviewed under the abuse of discretion standard and conclusions of law are reviewed *de novo*. A circuit court's entry of summary judgment is reviewed *de novo*.[144]

13. Petitioner is asserting ineffective assistance of counsel. As is repeatedly noted in cases dealing with ineffective assistance of counsel, the test deriving from *Strickland/Miller* is that counsel will be found constitutionally ineffective if: "(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors the result of the proceedings would have been different."[145]

14. In 1995, the *Miller* Court adopted the United States Supreme Court's *Strickland* test for evaluating the effectiveness of counsel necessary to conform to a defendant's constitutional right to counsel.[146] In Syllabus Point 5, the *Miller* Court held that:

> In West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*: (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The *Miller* Court also noted that:

> [C]ourts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions.

---

[143] *Mugnano v. Painter*, 212 W.Va. 831, 833, 575 S.E.2d 590, 592 (2002).
[144] *Id.* at Syl. Pt. 2.
[145] Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).
[146] *Id.*

24

Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Id.* at Syl. Pt. 6. Justice Cleckley, writing for the majority, also quoted *Strickland* to show that courts "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .'"[147] The Supreme Court has also held that "[u]nless claims of ineffective assistance of counsel have substantial merit, this Court, historically, has taken a negative view toward the assertion of frivolous claims."[148]

15. "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller* test is fatal to a habeas Petitioner's claim."[149]

16. The *Strickland* standard is not easily satisfied.[150]

17. In *Miller*, the Court outlined the challenge faced by a Petitioner claiming ineffective assistance, noting that judicial review of a defense counsel's performance "must be highly deferential" and explaining that there is a strong presumption that "counsel's performance was reasonable and adequate."[151] Moreover, the *Miller* Court held that there is a "wide range" of performance which qualifies as constitutionally-adequate assistance of counsel, stating that

> A defendant seeking to rebut th[e] strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a 'wide range.' The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

---

[147] *Id.* at 15, 459 S.E.2d at 126, *quoting Strickland*, 466 U.S. at 689.

[148] *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E.2d 416, 421 (1995).

[149] *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E. 2d 207 (1999).

[150] *See Miller*, 194 W. Va. at 16 ("the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."); *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 (1995) (ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"); *see also, Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005) ("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof").

[151] *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127.

25

*Id., see also, Vernatter* ("there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . .'") (quoting *Strickland*) (citations omitted).

18. A petitioner claiming ineffective assistance must identify the specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent assistance."[152]

19. The reviewing Court is then tasked with determining, "in light of all the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate.[153]

20. Identifying a mere mistake by defense counsel is not enough.[154] As the *Miller* Court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the Court continued, "perfection is not the standard for ineffective assistance of counsel."[155]

21. Even if defense counsel's conduct is deemed objectively unreasonable, and therefore satisfies the first *Strickland* prong, that conduct does not constitute ineffective assistance unless Petitioner can also establish that the deficient conduct had such a significant impact that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."[156] As the Supreme Court explained in *Strickland*, "[a]n error by

---

[152] *See Miller*, 194 W. Va. at 17, 459 S.E.2d at 128; *State ex rel. Myers v. Painter*, 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002)("The first prong of [the *Strickland*] test requires that a Petitioner identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment)(internal quotation marks omitted).

[153] *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

[154] *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958)("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice'").

[155] *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

[156] Syl. Pt. 5, *Miller, supra.*

26

counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[157] Thus, satisfying *Strickland's* "prejudice prong" requires a showing that counsel's deficient performance was serious and impactful enough to "'deprive the defendant of a fair trial, a trial whose result is reliable.'"[158]

22. There is no precise formula, applicable in all cases, which can be applied to determine if the constitutionally inadequate conduct in question so significantly degraded the reliability of the trial such that the prejudice prong is satisfied.[159] But there is no question that the burden of demonstrating prejudice lies with Petitioner.[160]

23. The West Virginia Supreme Court has noted that the standard for review of the performance of counsel in habeas matters is based upon *Strickland/Miller*. That standard requires that but for the alleged errors, the result in Petitioner's action *would* have been different, not *could* have been different.[161]

24. In cases involving a criminal conviction based upon a guilty plea, the prejudice requirement of the two-part test established by *Strickland* and *Miller* demands that a habeas Petitioner show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.[162]

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead

[157] *Strickland*, 466 U.S. at 691.

[158] *State ex rel. Strogen v. Trent*, 196 W. Va. 148 at n. 4, 469 S.E.2d 7, 12 (1996)(quoting *Strickland*, 466 U.S. at 687), *see also Myers*, 213 W. Va. at 36, 576 S.E.2d at 281 (2002)("The second or "prejudice" requirement of the *Strickland / Miller* test looks to whether counsel's deficient performance adversely affected the outcome in a given case").

[159] *See Legursky*, 195 W. Va. at 325, 465 S.E.2d at 427 ("Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case").

[160] *Strickland*, 466 U.S. at 693, *Legursky*, 195 W. Va. at 319, 465 S.E.2d at 421.

[161] *See, Brannon v. Pszcolkowski*, 2018 WL 4909886, No. 17-0629 (W. Va. Oct. 10, 2018).

[162] Syl. Pt. 6, *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E.2d 207 (1999).

guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill v. Lockhart*, 474 US 52 at 56-60 (1985).

Before a guilty plea will be set aside based on the fact that the defendant was incompetently advised, it must be shown that (1) counsel did act incompetently; (2) the incompetency must relate to a matter which would have substantially affected the fact-finding process if the case had proceeded to trial; (3) the guilty plea must have been motivated by this error.

Syl. Pt. 3, *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834 (1978).

25. In examining effective assistance of counsel in a guilty plea situation, Petitioner bears the burden of demonstrating that his counsel's performance was deficient and must also prove that the outcome of the proceedings would have differed had he gone to trial. A defendant must demonstrate that the deficient advice had a negative impact on the outcome of the proceedings. He must show that but for counsel's errors he would have insisted on going to trial and that the outcome of the proceedings would have been more favorable than the plea.[163]

26. In analyzing habeas petitions based upon guilty pleas, the West Virginia Supreme Court has stated that:

We agree with the habeas court's finding that the record during the proceedings below was sufficient to establish that the trial counsel's performance was not ineffective regarding Petitioner's competence, readiness, and voluntariness in entering into the plea agreement. In *Call v. McKenzie*, we observed that "[t]he most common issues in [h]abeas corpus cases are whether there were, indeed, knowing and intelligent waivers, whether there were facts outside the record which improperly caused the defendant to enter his plea, and whether defendant's counsel was indeed competent." We found that these issues "can all be finally resolved in the careful taking of the original plea" and outlined certain inquiries that should be made prior to the acceptance of a plea. Where a plea bargain has been entered into, "the trial court should spread the terms of the bargain upon the record and interrogate the defendant concerning whether he understands the rights he is waiving

---

[163] *Jerry R. v. Ballard*, 2014 WL 2723895, No. 13-1090, at **3-6 (W. Va. June 16, 2014).

28

by pleading guilty and whether there is any pressure upon him to plead guilty other than the consideration admitted on the record." Additionally,

> [a] trial court should spread upon the record the defendant's education, whether he consulted with friends or relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in [h]abeas corpus that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights.

*Jones v. Terry*, 2018 WL 1719521, No. 17-0093 (W. Va. Apr. 9, 2018). (Citations omitted).

27. Petitioner's claims are refuted by the careful taking of the original plea.

28. Despite Petitioner's claims, the indictment was not defective. Trial counsel was not ineffective in failing to challenge the indictment.

29. Petitioner states that the indictment count which charged robbery in the first degree was defective. First, Petitioner notes that no specific date is alleged, only the ___ day of September. Petitioner also states that the indictment is unintelligible and lacks the verbs necessary to charge any offense.

30. This Court **FINDS** that this contention was waived by not being argued on direct appeal. This is an issue which could have been, but was not, raised on direct appeal. Therefore, the presumption is that it has been waived. The West Virginia Supreme Court has held that

> Under the provisions of Chapter 53, Article 4A, Code of West Virginia, 1931, as amended, commonly known as "Post-Conviction Habeas Corpus," there is a rebuttable presumption that Petitioner intelligently and knowingly waived any contention or ground in fact or law relied on in support of his petition for habeas corpus which he could have advanced on direct appeal but which he failed to so advance.

Syl. Pt. 1, *Ford v. Coiner*, 156 W. Va. 362, 196 S.E.2d 91 (1972).

31. Since Petitioner filed a direct appeal without including this contention, the contention is waived and may not be addressed in this proceeding. Additionally, Petitioner specifically waived

29

the issue of ineffective assistance of appellate counsel. However, in careful consideration of Petitioner's claims, this Court has examined the contention and finds that it affords Petitioner no relief either as a standalone claim or as a component of ineffective assistance of counsel.

32. There is no legal requirement that a specific date be alleged in the indictment when time is not of the essence of the offense.

33. "No indictment or other accusation shall be quashed or deemed invalid. . . for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense . . . ."[164] Petitioner does not assert that time was of the essence in this offense. The lack of a specific date does not invalidate this indictment.

34. In considering the validity of the robbery count as a whole, the West Virginia Supreme Court has pronounced:

> Generally, the sufficiency of an indictment is reviewed *de novo*. An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syllabus Point 2, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996). This Court has held that, "An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based." Syllabus Point 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983). In this case, the indictment substantially followed the language of the statutes under which the appellant was charged. Thus, the appellant was informed of the nature of the offenses he allegedly committed, the statutes he allegedly violated, and the manner in which he allegedly violated said statutes.

*State v. David D. W.*, 214 W. Va. 167, 172-173, 588 S.E.2d 156, (2003).

35. Petitioner was charged—as clearly detailed in the indictment—with a violation of W. Va. Code 61-2-12(a). That section states, in part, that any person who commits robbery or attempted robbery by violence to the person by striking or beating is guilty of robbery of the first

---

[164] W. Va. Code § 62-2-10 (1923).

30

degree for which punishment is not less than ten years' incarceration. Notably, actual larceny of goods is not required. An attempted first-degree robbery and a completed first-degree robbery are punished equally.

36. Robbery is not defined in the statute. Robbery was defined at common law as the felonious taking of money or goods of value from another or in his presence, against his will, by force or by putting him in fear.[165] The robbery denounced in this section is the common-law crime, accepted in West Virginia as a felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting in fear.[166]

37. The indictment in this case stated that before the indictment was filed, Petitioner did unlawfully and feloniously commit violence by striking and beating the victim and did steal, take, and carry away money and property of the victim in Kanawha County. That indictment substantially follows the language of the statute. Reviewing the indictment by practical rather than technical considerations, it is apparent that the indictment informs Petitioner of the crime with which he was charged and the statute he was accused of violating, and thus would have enabled him to mount a defense and was likewise sufficient to protect him against being placed twice in jeopardy for the same offense.

38. The indictment was not defective. Therefore, no objectively proficient practitioner would have challenged the indictment. Had the indictment been challenged, this Court would have dismissed any objection. Petitioner does not demonstrate as a stand-alone ground that the indictment was defective. Equally, Petitioner satisfies neither prong of *Strickland/Miller* in

---

[165] *State ex rel. Vandal v. Adams*, 145 W. Va. 566, 115 S.E.2d 489 (overruled on other grounds by *State v. Manns*, 174 W. Va. 793, 329 S.E.2d 865, (1985)).
[166] *Young v. Boles*, 343 F.2d 136, (4th Cir. 1965).

31

attempting to demonstrate that counsel was ineffective in this particular. This contention affords Petitioner no relief.

39. Petitioner received precisely the sentence for which he bargained. Any claim that his sentence was excessive or severer than expected is simply not based on the evidence.

40. Importantly, the claim that Petitioner received an excessive sentence was addressed and dismissed by the Supreme Court of Appeals of West Virginia in the memorandum decision which affirmed Petitioner's sentence on direct appeal.[167] The decision noted that despite Petitioner's "dissatisfaction" with the sentence he received, the facts and circumstances of the case demonstrated that Petitioner's sentence did not shock the conscience of the Court nor was it objectively disproportionate. The Court compared the sentence to the legislative purpose of the punishment, and also to punishment with other jurisdictions and other sentences within this State.[168] The Court particularly noted that, "[i]n this case, petitioner and his co-defendants forcibly broke into an apartment to rob the victim of money and heroin. During the commission of the robbery, Petitioner struck the victim in the head with a large rock. Further, Petitioner agreed to his sentence as a part of his plea agreement."[169]

41. As the West Virginia Supreme Court has already determined that Petitioner's sentence was not excessive nor disproportionate, that contention may not be readdressed in this proceeding, as it is barred by the law of the case doctrine. "The law of the case doctrine 'generally prohibits reconsideration of issues which have been decided in a prior appeal in the same case, provided that

---

[167] *State v. Griffin*, 2017 WL 2492799, No. 16-0594 (June 9, 2017).
[168] *Id.* at **5-8.
[169] *Id.* at *6.

32

there has been no materials changes [sic] in the facts since the prior appeal, such issues may not be relitigated in the trial court or re-examined in a second appeal.'"[170]

42. This contention has been definitively decided against Petitioner in the direct appeal and may not be readdressed. Moreover, Petitioner agreed to the sentence of sixty years. Moreover, this Court was the sentencing Court and will note that it decided Petitioner's motion to reduce sentence not only on the ground that it was untimely, but also because Petitioner had presented nothing that persuaded the Court to reduce sentence. This contention affords Petitioner no relief.

43. This Court rejects Petitioner's contention that his plea was involuntary both because he "felt" coerced into pleading guilty and because counsel failed to ensure he knew the rights he was waiving. This contention is utterly belied by the written documents Petitioner executed at the time of his plea and his testimony at the plea hearing, both of which were proffered under oath. The careful taking of the original plea belies these claims. Moreover, a claim that the plea was involuntary could have been, but was not, pursued on direct appeal. Therefore, that issue been waived for the purpose of this proceeding. Nonetheless, this Court has examined that claim.

44. Petitioner executed a written plea of guilty in which he acknowledged the rights he had attendant to a trial and was waiving by pleading guilty. He acknowledged that he would be sentenced to sixty years' incarceration. Petitioner completed a rights waived by guilty plea form, which indicated that Petitioner knew he had and was waiving, among others, the right to plead not guilty or stand silent; the right to a jury trial; the right to remain silent or to testify; the right to compel witnesses in his defense and present evidence; the right to cross-examine the State's witnesses; the right to counsel; the right to appeal trial error; the right to proof beyond a reasonable doubt and a unanimous jury verdict; and the right to suppress evidence. Petitioner was 24 years

---

[170] *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 214 W. Va. 802, 808, 591 S.E.2d 728, 734 (2003) (quoting 5 Am.Jur.2d *Appellate Review* § 605 at 300 (1995)).

old and had completed 11 years of education at the time of his guilty plea. Petitioner stated he knew the elements of robbery and had discussed every fact and circumstance of the case with his attorney. Petitioner knew the decision to plead guilty was his and his alone. He again, in writing, acknowledged the rights he had and was waiving.

45. At the plea hearing, Petitioner acknowledged his understanding of the plea agreement and his understanding that he would be sentenced to sixty years. Petitioner was placed under oath and completed the documents referenced immediately above. Petitioner said his lawyer was prepared to try the case and had discussed the evidence and possible defenses. He was satisfied with his attorney. Counsel had discussed with him his constitutional rights in the guilty plea form and the written plea. Petitioner stated explicitly that he had no questions about his rights.

46. Petitioner understood the penalty was the same whether he pleaded guilty or went to trial. He knew that a jury trial required proof beyond a reasonable doubt. Petitioner agreed with his attorney that there were strategic advantages for pleading guilty. Petitioner had authorized his attorney to negotiate toward a plea agreement and he was satisfied with the plea, including the sixty-year sentence. Petitioner could read and write English and had nearly completed high school. He was not under the influence of drugs or alcohol when he pleaded.

47. The Court invited Petitioner to ask questions about anything in the paperwork. Petitioner recited, at length, his understanding of the rights he was waiving by pleading guilty. Petitioner indicated that he understood that he was waiving important constitutional rights.[171] Petitioner had no questions about his rights, the consequences of the plea, or the sentence.[172]

> We agree with the habeas court's finding that the record during the proceedings below was sufficient to establish that the trial counsel's performance was not ineffective regarding Petitioner's competence, readiness, and voluntariness in entering into the plea agreement. In *Call v. McKenzie*, we observed that "[t]he

---

[171] *See*, Plea Hearing Transcript at 23-26.
[172] *Id.* at 28.

34

most common issues in [h]abeas corpus cases are whether there were, indeed, knowing and intelligent waivers, whether there were facts outside the record which improperly caused the defendant to enter his plea, and whether defendant's counsel was indeed competent." We found that these issues "can all be finally resolved in the careful taking of the original plea" and outlined certain inquiries that should be made prior to the acceptance of a plea. Where a plea bargain has been entered into, "the trial court should spread the terms of the bargain upon the record and interrogate the defendant concerning whether he understands the rights he is waiving by pleading guilty and whether there is any pressure upon him to plead guilty other than the consideration admitted on the record." Additionally,

> [a] trial court should spread upon the record the defendant's education, whether he consulted with friends or relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in [h]abeas corpus that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights.

*Jones v. Terry*, 2018 WL 1719521, No. 17-0093 (W. Va. Apr. 9, 2018). (Citations omitted).

48. Petitioner's claims are utterly belied by the careful taking of the original plea. The plea was knowing, voluntary, and intelligent. The contention of an involuntary, unknowing, coerced plea entered into by an individual who did not understand his rights is completely refuted by the plea paperwork and the plea transcript. This contention affords Petitioner no relief. Moreover, the testimony at the omnibus hearing was that trial counsel "recommended" the binding plea to his client, but was prepared to go to trial if Petitioner rejected the plea. Although Petitioner testified he "felt" he had no choice but to plead, he has proffered nothing in the way of objective evidence to buttress that contention. Petitioner's plea was voluntary, knowing and intelligent.

49. This Court rejects Petitioner's claim that trial counsel was ineffective.

50. Petitioner asserts that trial counsel was ineffective for failing to move the Court to reconsider Petitioner's sentence. Rule 35 of the *West Virginia Rules of Criminal Procedure*

35

provides that one may move the sentencing Court to *reduce* sentence. Trial counsel did not make a motion to reduce sentence.

51. It would have been inappropriate for counsel to move to reduce Petitioner's sentence. The plea in this matter was a binding plea under Rule 11 of the *Rules of Criminal Procedure*. A binding plea differs from other plea bargains in that the parties (the State and the Defendant) agree that a certain sentence will be imposed. If the Court accepts the binding plea agreement, the Court has no option other than to sentence the Defendant as provided for in the binding plea.

52. This plea was binding under the *West Virginia Rules of Criminal Procedure*. Pursuant to Rule 11, certain types of plea agreements exist by which the parties agree that a specific sentence is the appropriate disposition in the case. Here, Petitioner's plea was such an agreement. Petitioner would plead guilty to first-degree robbery and receive a determinate sentence of sixty years. Under this type of agreement, the Court may either accept or reject the entire plea agreement, but it may not accept the plea and impose a different sentence than the parties agreed to.[173]

53. In this case, defense counsel filing a Rule 35 motion to reduce the sentence or appealing the sentence would have been futile and a breach of the plea agreement. Plea agreements are contracts and each side is entitled to specific performance of that contract. "[W]hen a defendant enters into a valid plea agreement with the State that is accepted by the trial court, an enforceable 'right' inures to both the State and the defendant not to have the terms of the plea agreement breached by either party."[174]

54. The State was entitled to specific performance of the plea agreement, which encompassed Petitioner agreeing to the plea and the Court imposing a specific sentence. Trial counsel was not ineffective for failing to move to reduce sentence as this would breach the plea

---

[173] *State ex rel. Forbes v. Kaufman*, 185 W. Va. 72, 404 S.E.2d 763 (1991.)
[174] *State v. Myers*, 204 W. Va. 449 at 459, 513 S.E.2d 676 at 686 (1998).

36

agreement and the Court could not have agreed to reduce the sentence without itself breaching the plea. This contention affords Petitioner no relief. Moreover, Petitioner has failed to produce any evidence whatsoever that this Court would have reduced his sentence under any circumstance. Further, Petitioner's sentence was already upheld by the West Virginia Supreme Court on appeal.

55. Petitioner complains that counsel was ineffective for failing to appeal. This contention is not well-grounded. An appeal was taken, by counsel, in Petitioner's case, as described thoroughly above. This contention affords Petitioner no relief. Moreover, as noted above, Petitioner specifically waived any issue with appellate counsel.

56. As was already determined, the indictment in this matter was not defective and therefore counsel was not ineffective for failing to challenge the indictment. This contention affords Petitioner no relief.

57. The *Petition* claims that better communication, or at least more frequent communication, would have resulted in Petitioner better understanding the rights he was waiving. The plea colloquy demonstrates that Petitioner, under oath, repeatedly stated that he understood all the rights he had and the consequences of waiving those rights. Therefore, since Petitioner knew his rights and the consequences of the waiver as amply demonstrated by his repeated assertions under oath at the plea hearing, no further communication was necessary regarding his rights.

58. Moreover, both the plea colloquy and the associated plea documents equally demonstrate that Petitioner knew and understood that he was agreeing to receive a sentence of sixty years. Moreover, no additional communication with Petitioner would have resulted in a better plea offer from the State, or at any rate, Petitioner has failed to prove this claim.

59. It is apparent from the record that the State's plea offer to first-degree robbery was predicated upon the violent and abhorrent circumstances of this case. Petitioner and his co-

37

defendants plotted to rob and harm the victim. They went to an apartment where the victim was alone. Petitioner hit the victim in the head with a rock. The victim, in fear for his life, attempted to escape and fell to his death. Petitioner might have been convicted of felony murder and received life in prison, had he proceeded to trial.

60. The State's rationale for the plea offer and the recommendation of sixty years was because Petitioner went into the apartment, struck the victim, robbed him, and was responsible, with his co-defendants, for the victim's death. The State made the offer, which Petitioner chose to accept. Had Petitioner's counsel made a counter offer, there is no indication of record the State would have accepted it.

61. Petitioner also claims that counsel failed to review potentially exculpatory evidence and that such failure "could" have led to a different result. Apparently, this exculpatory evidence was the much-discussed surveillance video which shows Petitioner and his co-defendant entering the apartment where the crime occurred and leaving. The video is time-stamped. Petitioner never testified that he would not have pleaded guilty to robbery had counsel reviewed the video and discussed it with him. The video in question exculpated Petitioner of murder, according to defense counsel's theory. Defense counsel believed he reviewed the video, although his recollection was not specific. He did, however, before the plea, discuss the video with his co-counsel and knew what the video portrayed before he recommended the plea to his client. The video was not exculpatory as to the robbery. Additionally, the evidence in this matter as to robbery was overwhelming against Petitioner. That evidence consisted of video surveillance showing Petitioner entering and leaving the apartment where the victim was robbed, leaving his watch behind, inculpatory statements by his co-defendants, and his own confession.

38

62. In sum, Petitioner confessed, was seen on video, and was implicated by each of his co-defendants. There was no exculpatory evidence which counsel failed to investigate and which would have affected the result in this proceeding.

63. The Supreme Court of Appeals of West Virginia has noted that the standard for review of the performance of counsel in habeas matters is based upon *Strickland/Miller*. That standard requires that but for the alleged errors, the result in Petitioner's action *would* have been different not *could* have been different.[175]

64. The burden lies upon Petitioner to prove his claims with evidence and not engage in mere speculation. It appears, at least in regard to the claim of ineffective assistance of counsel, that Petitioner has engaged in a mere recitation of claims without sufficient evidentiary foundation, thereby rendering those claims subject to a summary dismissal.

65. The evidence of record demonstrates that no error of a constitutional dimension occurred in the underlying criminal proceeding in which Petitioner entered into a knowing, voluntary, and intelligent guilty plea represented by effective counsel.

## DECISION

Therefore, based upon a thorough and complete review of the complete contents of the criminal case file in this matter, in consideration of the testimony at the omnibus evidentiary hearing, and considering the arguments of counsel for Petitioner and the Warden both at the hearing and in written submissions, it is **ORDERED** that the *Amended Petition for Writ of Habeas Corpus* be **DENIED**. It is further **ORDERED** that said civil action be **DISMISSED** and **STRICKEN** from the docket of this Court. The Court notes the exceptions and objections of Petitioner. It is further **ORDERED** that the Clerk of the Circuit Court of Kanawha County send

---

[175] *See, Brannon v. Pszcolkowski*, 2018 WL 4909886, No. 17-0629 (W. Va. Oct. 10, 2018).

certified copies of this *Final Order* to counsel of record. Counsel will not be appointed automatically for the purpose of appealing this *Final Order*. If Petitioner wishes to have counsel appointed for the purpose of appeal, he must file a motion with the Court requesting the appointment of counsel. Further, Petitioner is notified that the notice of appeal must be filed within thirty days of the entry of this order.

ENTERED this 1ST day of July 2019

_____
Louis H. Bloom

Prepared by:

Laura Young
Assistant Prosecuting Attorney
301 Virginia St., E.
Charleston, WV 25301
WV Bar ID# 4173

40